Aaron Goodman (Arizona Bar No. 024401)
Aaron.Goodman@bakermckenzie.com
Baker & McKenzie LLP
10250 Constellation Boulevard
Suite 1850
Los Angeles, California 90067
Telephone: +1 310 201 4728
Facsimile: +1 310 201 4721

Jennifer Ancona Semko (*pro hac vice*)
Jennifer.Semko@bakermckenzie.com
Marisa Bakker (*pro hac vice*)
Marisa.Bakker@bakermckenzie.com
Baker & McKenzie LLP
815 Connecticut Avenue NW
Washington D.C., 20006
Telephone: +1 202 835 4250
Facsimile: +1 202 416 7055

Attorneys for Plaintiff
Invent UAE Co. LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Invent UAE Co. LLC, | |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Azzuro, Inc. and Bonno Koers, | |
| Defendants. | |

Plaintiff, Invent UAE Co. LLC, by and through its undersigned attorneys, brings this Complaint against Defendants, Azzuro, Inc. and Bonno Koers, and states as follows:

**PARTIES**

1.      Plaintiff Invent UAE Co. LLC ("Plaintiff") is a Dubai limited liability corporation with its principal place of business in Dubai, United Arab Emirates ("UAE").

2.      Defendant Azzuro, Inc. ("Azzuro") is a Delaware corporation with its principal

place of business in Arizona.  Defendant is located at P.O. Box 27590, Scottsdale, Arizona, 85255, USA.

3.     Defendant Bonno Koers is, on information and belief, the founder, President, Chief Executive Officer, sole shareholder, and sole director and officer of Defendant Azzuro.  He is an individual domiciled in Arizona, and his last known address is 8160 East Cow Track Drive, Carefree, Arizona, 85377, USA.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332.  There is complete diversity between Plaintiff, a Dubai limited liability corporation with its principal place of business in Dubai, and Defendants, a Delaware corporation with its principal place of business in Arizona and an individual domiciled in Arizona. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.     Azzuro is subject to personal jurisdiction in this Court because Azzuro has its principal place of business in Arizona and, therefore, is a citizen of Arizona.  Additionally, on information and belief, Azzuro regularly transacts business in Arizona and has contacts sufficient to subject it to personal jurisdiction in Arizona, including acts giving rise to this litigation.

6.     Koers is subject to personal jurisdiction in this Court because he is domiciled in Arizona and has contacts sufficient to subject him to personal jurisdiction in Arizona, including acts giving rise to the litigation.

7.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants are residents of this District, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

***Relationship of the Parties***

COMPLAINT

8.     Since it was incorporated in 2005, Plaintiff has been operating in the Middle East as an exclusive commercial representative and licensed partner of several multinational waste treatment and energy equipment manufacturing companies.  As a result of its strong regional network and reputation and technological expertise, Plaintiff has established itself as a leader in the waste water treatment, solid waste recovery, power generation, odor control systems and air quality monitoring and measurement industries in the Middle East.

9.     Plaintiff also serves as one of the largest suppliers of advanced and innovative equipment for wastewater treatment, solid waste treatment, power generation, odor control and air quality management in the Middle East, specializing in sustainable building materials.

10.     Plaintiff's primary assets are its relationships with key regional players in the waste water treatment, solid waste recovery, power generation, odor control systems and air quality monitoring and measurement industries.  As a commercial representative, Plaintiff leverages its strong industry connections to obtain opportunities for paid work for its clients.  For example, Plaintiff often promotes the work of its clients in the Middle East and arranges meetings between its clients and its contacts in the client's industry, in order to obtain opportunities for paid work for the client.  After the initial meeting, Plaintiff will typically facilitate future meetings and discussions between the client and the contact.

11.     Because Plaintiff's value as a commercial representative derives largely from its industry contacts, many of whom are high-level individuals in local municipalities and consulting firms, Plaintiff safeguards and carefully manages its relationships with its industry contacts.

12.     Azzuro specializes in advising on, designing and supplying air and water pollution control solutions to clients across a number of industries, including the petrochemical, agriculture, food and beverage, wastewater treatment and cellulose and pulp processing industries.

13.     On information and belief, prior to appointing Plaintiff as its exclusive commercial

COMPLAINT

representative, Azzuro had little or no business in the Middle East.  Prior to appointing Plaintiff as its exclusive representative, Azzuro's only relationship in the region was with the Amjan Municipality and Planning Department, with which Azzuro bid—but was not selected—for an expansion works project, because Azzuro did not satisfy certain technical requirements.

14.     After numerous failed attempts to penetrate the Middle Eastern market, and knowing Plaintiff's reputation for having strong regional influence, regional contacts and technological expertise, in or about 2016, Defendants entered into negotiations with Plaintiff concerning Plaintiff's appointment as Azzuro's  exclusive commercial representative.

15.     During the course of negotiations, Plaintiff offered to introduce Azzuro to its regional contacts and promote Azzuro's products, in order to secure projects for Azzuro.   In exchange, Azzuro agreed to pay Plaintiff a commission equal to 20 percent of each project's total contract value, in order to offset the cost to Plaintiff for its promotional and marketing activities, maintaining an office and team to service Azzuro's account, client handling and attending regular meetings with Azzuro and/or prospective clients.

16.     On September 14, 2017, the parties executed an Exclusive Authorized Representative Agreement (the "EAR Agreement"), whereby Azzuro appointed Plaintiff as its Exclusive Authorized Representative ("EAR") in the Middle East (including Bahrain, Kingdom of Saudi Arabia, Kuwait, Qatar, Sultanate of Oman and United Arab Emirates) (the "Territory") and for a market comprising of air odor treatment applications associated with publicly and privately owned sewage treatment works (the "Market").  In exchange, Plaintiff agreed to "solicit and obtain orders" for certain of Azzuro's products from customers located in the Territory and serving the Market.  A true and correct copy of the EAR Agreement is attached hereto as **Exhibit A**.

*Key Provisions of the EAR Agreement*

17.     Plaintiff's obligations under the EAR Agreement were to promote Azzuro's

business and help Azzuro obtain projects in the Territory, as reflected in Section 2 of the EAR Agreement, which obligated Plaintiff to:

> a) diligently promote, solicit and obtain Orders; b) promptly transmit all inquiries for quotations to Azzuro; c) make available to Azzuro the names and addresses of such purchasers and prospective purchasers and agree not to disclose the names and addresses of such purchasers or prospective purchasers to any other person, firm, or corporation; d) perform all acts reasonably necessary and desirable to establish, maintain and expand the Market and to provide adequate sales coverage for Products; e) maintain an adequate facility and efficient sales force; f) furnish Azzuro with such reports, information, sales forecasts and data relating to the performance of [Plaintiff] under this Agreement as Azzuro shall from time to time request; g) notify Azzuro immediately upon receipt of any information adversely affecting or likely to adversely affect the credit of any customer; and, h) carry out its appointment in such a way as to protect the business, name and reputation of Azzuro.

18.     In Section 3 of the EAR Agreement, both parties expressly agreed that "[n]either . . . Party [shall] misrepresent the status of its relationship with the other pursuant to this Agreement."

19.     Importantly, the EAR Agreement expressly confers sole discretion to Plaintiff to determine the "best" manner by which to perform its contractual obligations.  As Section 4 states, "[Plaintiff] [i]s and shall conduct all of its business as an independent contractor, in its own name, and *in such manner as it deems best . . .* " (emphasis added).

20.     For its services, Plaintiff was to be compensated in accordance with Sections 7 and 8 of the EAR Agreement.  Section 7, governing compensation, provides that "[i]n the event the [Plaintiff] obtains an Order that is accepted by Azzuro, the [Plaintiff] will be entitled to receive a commission in accordance with the provisions of this Agreement . . . "  Under Section 8, governing commissions, Azzuro "shall pay the [Plaintiff] a commission of 20% of the total purchase order amount for sale of Products sold in accordance with the Agreement if [Plaintiff] can get Azzuro products sold with that mark-up."  However, in the event that Azzuro's product or project "cannot get sold with a 20% mark-up a sales strategy," Section 8 provides that the parties may negotiate an adjusted commission.  Section 8 further provides that "commission shall be paid on a project by

COMPLAINT

project basis, and will be paid to the [Plaintiff] 14 days after [Azzuro] receives payment from the End User or Contractor. These payment terms also apply to progress payments or partial payments."

21.     Section 17 of the EAR Agreement provides that the EAR Agreement may be terminated by either party "for any reason and without cause," provided the terminating party gives the other party 60 days' notice prior to termination.  Should either party terminate the EAR Agreement for cause, the terminating party must send an official notice letter to the other party "with a three-months' grace period before actually terminating. Upon three-month's notice of termination, [Plaintiff] shall promptly supply Azzuro the list of active projects that have not yet been finalized."

22.     Section 17 defines termination for cause as follows: (1) "[i]f Azzuro does not perform, submit incorrect technical and commercial offer, do not meet client's needs, do not attend meetings with clients and if they do not answer the client's request for a proposal in a timely fashion," or (2) "[i]f [Plaintiff] does not arrange client meetings and if [Plaintiff] is not active in the market on behalf of Azzuro."

23.     Section 17 also provides for termination in the event of material breach, stating, "In the event of a material breach of this Agreement, the non-breaching party may terminate this Agreement upon five (5) days prior written notice to the breaching party."  However, the EAR Agreement does not expressly define "material breach."

24.     Importantly, the EAR Agreement expressly provides that, even in the event that the EAR Agreement is terminated, Plaintiff is nonetheless entitled to earned commission on both existing and not-yet-awarded projects.  Section 18 states:

> No termination of this Agreement shall affect the rights or obligations of either of the Parties that shall have accrued prior to the effective date of such termination, *including [Plaintiff's] right to receive, in accordance with the provision of this Agreement, any commissions under this Agreement on Orders obtained by [Plaintiff] in accordance with this Agreement and accepted by Azzuro before such termination*. Upon notice of termination,

> [Plaintiff] shall promptly supply Azzuro with a written list of all active potential Orders, including the status of the Orders. Although this Contract then has ended, *the projects on this list shall be handled according to this Agreement, which means [Plaintiff] cannot approach these projects with an alternative supplier and Azzuro will pay [Plaintiff] commission if the project becomes an Order . . .*

(emphasis added).

***Defendants Improperly Terminate EAR Agreement***

25.     Plaintiff has at all times performed its contractual obligations.  Between September 2017 and September 2019, Plaintiff diligently promoted Azzuro's brand and worked to solicit and obtain contracts for Azzuro.  By conducting market research to identify opportunities for paid work, leveraging its relationships with key players in the region, arranging sales promotion events and meetings with high-profile regional clients and approaching the major municipalities and consultants in the region, Plaintiff secured for Azzuro a total of 32 opportunities in the Middle East, including in Oman, UAE, Saudi Arabia and Qatar.  These projects (the "Projects") are valued at approximately $31,058,570.00 total.  A list of the Projects, including the approximate value and current known status of each Project, is included at **Exhibit B**.

26.     As a result of Plaintiff's diligent promotion, Azzuro had already been awarded three contracts by the time it unlawfully terminated Plaintiff as its representative: Sewerage Pumping Station 12B (valued at USD $176,000.00), which was awarded to Azzuro on July 30, 2018; the Palm Jumeirah Pumping Station 2 (valued at USD $85,000.00), which was awarded to Azzuro on May 9, 2019; and Upgrading of Raysut - Phase I & II (valued at $4,050,000.00), which was awarded to Azzuro on February 21, 2019 (collectively, the "Awarded Projects").  The Awarded Projects were the result of tenders by the Amjan Municipality, the Dubai Municipality, and Galfar Engineering and Contracting ("Galfar"), respectively.

27.     The remaining projects, which were also opportunities presented to Azzuro as a direct result of Plaintiff's diligent promotional efforts, are in various stages of tendering (the

COMPLAINT

"Pipeline Projects").

28.     To the extent that Azzuro was not selected as the winning bidder for any of the Pipeline Projects, this was a direct result of Azzuro's own deficiencies and actions/inactions, and not due to any action or inaction on the part of Plaintiff.

29.     Notwithstanding Plaintiff's diligent promotion of Azzuro and Azzuro's products and services, by letter dated September 17, 2019 signed by Defendant Koers, Defendants unilaterally terminated the EAR Agreement (the "Termination Letter").  The Termination Letter falsely claimed that, although the parties had worked well together at the outset of their commercial relationship in 2017, Plaintiff purportedly breached the EAR Agreement by not actively promoting Azzuro's products and otherwise not performing its contractual obligations.

30.     The Termination Letter stated that termination would be effective five days after receipt of the letter.

31.     The Termination Letter, signed by Defendant Koers as Azzuro's Chief Executive Officer, included a return address of PO Box 27590, Scottsdale, AZ 85255-0143.

32.     Although the Termination Letter described several purported material breaches by Plaintiff of the EAR Agreement, Defendants knowingly misrepresented the circumstances surrounding each alleged breach.  The claimed "breaches" outlined in the Termination Letter amount to nothing more than mere pretext for terminating the EAR Agreement with insufficient notice, and in order to avoid paying Plaintiff the earned and future commissions it is rightly owed for the Awarded Projects and Pipeline Projects.

33.     For example, Defendants' unsupported claim that "it is clear . . . that there has been no reasonable endeavor on your part to attract customers and obtain sole-sourced roles and sales in projects in the region" is contradicted by the existence of the Projects.

34.     Additionally, contrary to Defendants' claim that Plaintiff was absent from key

meetings with one customer, Galfar, in fact, it was *Defendants* that failed to attend several key meeting with Galfar.  These meetings, which took place in Oman, were held to address Defendants' general lack of responsiveness and delay in submitting certain tender materials.  To the extent that Plaintiff missed any meetings with Galfar, it was because Defendants failed to inform Plaintiff of the meetings.

35.    Likewise, Defendants' allegation in the Termination Letter that "[Plaintiff] ha[s] been very clear that you do not want to work nor want to communicate with [Azzuro's  Regional Sales Manager ("RSM")], for reasons we cannot understand" lacked any basis.  At no point did Plaintiff indicate an unwillingness to communicate with Azzuro's RSM.   Instead, several prospective clients—including Galfar—informed Plaintiff that they were unwilling to work with Azzuro's RSM, as a result of his rude and unprofessional conduct.

36.    Contrary to Defendants' claim that changes in Plaintiff's personnel had resulted in Plaintiff's failure to ensure "adequate and skilled representation" of Azzuro, Plaintiff at all times maintained appropriate staffing levels.  At no point did changes in Plaintiff's personnel impact Plaintiff's ability to skillfully represent Azzuro commercially in the Middle East.

37.    Finally, Defendants' claim in the Termination Letter that Plaintiff owed Azzuro a duty to obtain "competitive pricing," and that Plaintiff's 20 percent commission required Azzuro to lower its prices nearly to cost, is baseless.  Plaintiff had no such contractual duty.  Likewise, Plaintiff had no power over Azzuro's pricing, which was Azzuro's sole responsibility.  Additionally, even if Plaintiff's 20 percent commission rendered it commercially impossible for Azzuro to bid competitively, which Plaintiff disputes, the EAR Agreement expressly provided that the parties could negotiate an adjusted commission on a project-by-project basis.

38.    After wrongfully terminating the EAR Agreement, Defendants have flatly refused to pay Plaintiff the commissions it is unquestionably owed on the Awarded Projects and have

refused to confirm their obligation to pay Plaintiff the commissions it is owed for the Pipeline Projects once those projects are awarded.

39.     Further, Defendants have continued to deal directly with and solicit paid work from Plaintiff's regional contacts, thus reaping the benefit of Plaintiff's prior promotional work and strong network, without any compensation to Plaintiff.

40.     Worse, Defendants have misrepresented the status of the parties' relationship to Plaintiff's regional contacts.  For example, Defendants have misrepresented that they terminated the EAR Agreement as a result of Plaintiff's material breach, damaging Plaintiff's relationships with its regional contacts and its reputation in the region.

41.     Defendants continue to unjustly profit from Plaintiff's labor, for which they refuse to compensate Plaintiff.  For example, Azzuro's website prominently lists its relationships with key clients, including the Dubai Municipality (see **Table 1** below).  But for Plaintiff, Azzuro would not have secured projects with the Dubai Municipality.

**Table 1. Excerpt from Azzuro's website.**

COMPLAINT

42.     On information and belief, Defendants terminated the EAR Agreement in order to cut out the middle man—Plaintiff.  In so doing, Defendants deprived Plaintiff of past-due and future commission payments under the EAR Agreement, while benefitting from Plaintiff's hard work on their behalf and retaining one of Plaintiff's primary assets—its strong relationships and industry contacts in the Middle East.

43.     To date, Defendants have only paid Plaintiff less than $18,000 in commission for the Awarded Projects.  Defendants have refused to pay the remaining commission owed for the Awarded Projects, which totals $611,411.79.

44.     Defendants have not paid Plaintiff any commission in connection with the Pipeline Projects.

***Plaintiff Attempts a Mediated Resolution***

45.     Following Defendants' unilateral termination of the EAR Agreement in September 2019 and refusal to pay Plaintiff the commissions it is owed, Plaintiff in July 2020 instituted mediation proceedings before the Centre of Amicable Resolutions of Disputes in Dubai (the "Centre"), requesting that the dispute be referred to an accounting expert to evaluate its demand for unpaid commissions.

46.     After reviewing documentation submitted by the parties, the expert found that Plaintiff was unquestionably entitled to a commission of $611,412 on the Awarded Projects.  The accounting expert declined to find and calculate commissions potentially owed to Plaintiff for the Pipeline Projects, as those projects had not yet been awarded and paid for.

47.     In spite of the expert's finding, Defendants still refuse to pay Plaintiff the commissions to which it is owed, nor have Defendants compensated Plaintiff in any way for its work to identify, promote and secure the Defendants' ability to bid for the Projects.

***Forum Selection Clause***

COMPLAINT

48.     This Court is an appropriate forum for the instant dispute because it possesses subject matter jurisdiction over the dispute and personal jurisdiction over the Defendants.

49.     Although the EAR Agreement contains a purported forum-selection clause, that clause is pathological—its terms are essentially nonsensical, not capable of implementation, and therefore null and void.

50.     Specifically, Section 22 of the EAR Agreement provides that "any controversy or claim between the parties . . . unless an alternative jurisdiction is selected by Azzuro, shall be adjudicated exclusively in the Courts of the European Union . . . Provided, however, if Azzuro so directs, the controversy or claim shall be resolved by binding arbitration administered by an International Arbitration Association under its Commercial Arbitration Rules and according to the rules of the New York Convention . . . "

51.     No "Courts of the European Union" exist for the resolution of commercial disputes, however.  Thus, it is impossible to enforce the forum selection clause in Section 22, rendering the forum selection clause void and unenforceable.

52.     To date, and despite Plaintiff's invitation to do so, Defendants have not directed that the dispute be resolved by binding arbitration.  As a result, resolution of the dispute in this Court is justified and appropriate.

**COUNT I**

**PIERCING THE CORPORATE VEIL**

53.     Plaintiff incorporates Paragraphs 1 through 52 above by reference as though set forth fully herein.

54.     Upon information and belief, at all relevant times, Azzuro has been and continues to be the alter ego of Defendant Bonno Koers.

55.     Defendant Koers, as founder, sole shareholder, Director, Secretary, Treasurer,

President/Chief Executive Officer and Chairman of the Board, has substantially total control of the management and activities of Azzuro.

56.     Upon information and belief, Azzuro, acting by and through Defendant Koers, has failed to observe required corporate formalities in its daily operations under Arizona law.

57.     Upon information and belief, Defendant Koers failed to adequately capitalize Azzuro and utilized funds and assets belonging to Azzuro for his personal use and benefit.

58.     Azzuro does not maintain a physical office space, and the only physical addresses associated with the company are Defendant Koers' personal residences.

59.     Azzuro's website lists four global "offices" in North America, Europe,  Middle East and Australia, each of which is a P.O. Box.  In fact, the purported "office" for Azzuro's North America and the Middle East locations is the same Arizona-based P.O. Box 27590 in Scottsdale, Arizona.

60.     Arizona Corporation Commission records identify Azzuro's "principal office address" as 1209 Orange Street, Wilmington, Delaware, but this is the location of a commercial registered agent firm, The Corporation Trust Company.  Upon information and belief, Azzuro does not actually maintain an office or business operations at that address.

61.     Additional records with the Arizona Corporation Commission provide an address for Azzuro at 8160 East Cow Track Drive in Carefree, Arizona, which public records reveal is a residential home that was owned by Defendant Koers until November 13, 2020, when it was sold to Chenelle R. Koers, whose address is listed as P.O. Box 27590, Scottsdale, AZ 85255—the same P.O. Box used by Azzuro.

62.     The EAR Agreement identifies Azzuro's business address as 4003 East La Ultima Piedra Drive, Carefree, AZ 85377, USA, which property records indicate is a residential home that Defendant Koers once occupied.

63.     Azzuro lacks a separate corporate existence from Defendant Koers.

64.     Continued recognition of Azzuro's corporate form would only serve to promote injustice, by absolving Defendant Koers of liability for bad acts perpetrated by him.

65.     The corporate veil should be pierced as to Azzuro and Defendant Koers held personally liable for damages caused to Plaintiff, in an amount to be proven at trial.

## COUNT II

## BREACH OF CONTRACT

66.     Plaintiff incorporates Paragraphs 1 through 65 above by reference as though set forth fully herein.

67.     Plaintiff and Azzuro are each a party to the EAR Agreement, whereby Azzuro appointed Plaintiff as its Exclusive Authorized Representative for customers located in the Territory and serving the Market.

68.     Plaintiff has at all times performed its obligations under the EAR Agreement, by *inter alia* introducing Azzuro to key regional players, arranging sales promotion events and meetings with high-profile regional clients and approaching the major municipalities and consultants in the region on Azzuro's behalf.  As a result of Plaintiff's diligent promotion of Azzuro and Azzuro's products, in accordance with Section 2 of the Agreement, Plaintiff secured the Projects for Azzuro.

69.     Azzuro, however, has breached the EAR Agreement by improperly terminating the agreement, refusing to pay commissions owed on the Projects, and falsely representing the nature of its relationship with Plaintiff.

70.     Azzuro breached Section 17 of the EAR Agreement by terminating the EAR Agreement without justification and upon only five days' notice, despite the fact that Plaintiff had not materially breached the EAR Agreement.

COMPLAINT

71.     Additionally, Section 7 of the EAR Agreement expressly obligates Azzuro to pay Plaintiff a commission of "20% of the total purchase order amount" within 14 days after Azzuro receives payment from the End User or Contractor.

72.     The total commission currently owed to Plaintiff for the Awarded Projects under the EAR Agreement is $611,412.00.

73.     On information and belief, Azzuro has received payment from the End User or Contractor for the Awarded Projects.

74.     Pursuant to Section 18 of the EAR Agreement, following termination of the EAR Agreement, Azzuro must nonetheless pay Plaintiff "any commissions . . . on Orders obtained by EAR in accordance with this Agreement and accepted by Azzuro before such termination."

75.     Yet, Azzuro refuses to pay Plaintiff its commission on the Awarded Projects.  By refusing to pay Plaintiff the $611,412.00 commission owed on these projects, Azzuro has breached the EAR Agreement.

76.     Additionally, the Pipeline Projects include opportunities secured by Plaintiff on Azzuro's behalf, which Azzuro either accepted prior to terminating the EAR Agreement or were included on the written list of active potential Orders Plaintiff supplied to Azzuro after Plaintiff's improper termination, including four projects—valued at approximately $1.8 million—for which Plaintiff was prevented from bidding as a result of Azzuro's unlawful termination, but which Plaintiff had already expended significant resources in furtherance of.

77.     The total contract value for these Pipeline Projects exceeds $26 million, and the total Azzuro currently owes or will owe to Plaintiff for the Pipeline Projects is in excess of $6.4 million.

78.     By refusing to pay Plaintiff its commissions on the Pipeline Projects, Azzuro has breached Sections 7, 8 and 18 of the EAR Agreement.

COMPLAINT

79.      Azzuro has likewise breached Section 3 of the EAR Agreement, which prohibits either party from "misrepresent[ing] the status of its relationship with the other pursuant to this Agreement," by misrepresenting the reasons for its termination of the EAR Agreement and the nature of its relationship with Plaintiff to several of Plaintiff's regional contacts.

80.      As a direct and proximate result of Azzuro's actions, Plaintiff has suffered damages in an amount to be proven at trial, in an amount exceeding $75,000.

**COUNT III**

**BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING**

81.      Plaintiff incorporates Paragraphs 1 through 80 above by reference as though set forth fully herein.

82.      Plaintiff and Azzuro are each a party to the EAR Agreement, whereby Azzuro appointed Plaintiff as its Exclusive Authorized Representative for customers located in the Territory and serving the Market.

83.      Plaintiff has at all times performed its obligations under the EAR Agreement, by *inter alia* introducing Azzuro to key regional players, arranging sales promotion events and meetings with high-profile regional clients and approaching the major municipalities and consultants in the region on Azzuro's behalf.  As a result of Plaintiff's diligent promotion of Azzuro and Azzuro's products, in accordance with Section 2 of the Agreement, Plaintiff secured the Projects for Azzuro.

84.      Azzuro is contractually bound by Sections 7, 8 and 18 to pay Plaintiff commission on opportunities obtained by Plaintiff.  Termination of the EAR Agreement does not relieve Azzuro of its payment obligation.

85.      Azzuro owes Plaintiff implied duties of good faith and fair dealing in its performance of the EAR Agreement.

86.     Azzuro breached these implied duties by terminating the EAR Agreement without justification and, on information and belief, for the sole purpose of using Plaintiff's promotional work and relationship network to its own financial advantage and to deprive Plaintiff of its commission under the EAR Agreement.

87.     On information and belief, Azzuro continues to pursue direct relationships with and to solicit paid work from Plaintiff's regional contacts following termination of the EAR Agreement.

88.     Azzuro wrongfully deprived Plaintiff of its benefit under the EAR Agreement, or its right to receive commission payments.

89.     As a direct and proximate result of Azzuro's actions, Plaintiff has suffered damages in an amount to be proven at trial, in an amount exceeding $75,000.

**COUNT IV**

**DECLARATORY JUDGMENT**

90.     Plaintiff incorporates Paragraphs 1 through 89 above by reference as though set forth fully herein.

91.     For the reasons alleged herein, an actual controversy currently exists regarding the rights and obligations of Plaintiff and Azzuro, including whether Plaintiff is entitled to the payment of commission on the Pipeline Projects under the EAR Agreement.

92.     There exists a current and substantial controversy between Plaintiff and Azzuro of sufficient immediacy and certainty to warrant the issuance of a declaratory judgment.  As set forth above, Azzuro has repeatedly disclaimed its duty to pay Plaintiff commission to which it is entitled.

93.     Accordingly, a prompt judicial determination of the respective rights and duties of the parties in these respects is necessary and appropriate under the circumstances.

94.     Specifically, Plaintiff seeks a declaration from the Court that it is entitled to receive commission on the Pipeline Projects—including but not limited to 1) projects upon which Azzuro

has bid, but has not yet been awarded and 2) projects which Azzuro has been awarded, but has not received payment from the End Customer—when Azzuro receives payment from the end customer.

95.     In addition, Section 14 of the EAR Agreement entitles Plaintiff to reimbursement of its attorneys' fees incurred in connection with this matter.

96.     Under that provision, "Each party agrees to indemnify and hold the other harmless from and against all claims, damages, losses, costs, and liability *arising solely out of or in any way connected with the performance of their obligations under this Agreement*, including, but not limited to, the making of any unauthorized representation, misrepresentation concerning the relationship between Azzuro and [Plaintiff], or for the breach of any law by the parties, their respective employees or affiliates." (emphasis added)

97.     Plaintiff has incurred and will continue to incur "claims, damages, losses [and] costs," including costs of its counsel, in connection with Azzuro's performance of its obligations under the EAR Agreement, as well as this litigation, all amounts that Azzuro has refused to pay.

98.     As a result, Plaintiff also seeks a judicial declaration that it is entitled to indemnification of these expenses under Section 14 of the EAR Agreement.

## COUNT V

## **UNJUST ENRICHMENT**

99.     Plaintiff incorporates Paragraphs 1 through 98 above by reference as though set forth fully herein.

100.     At all times relevant to this litigation, Azzuro owed a legal duty to Plaintiff to not unfairly or unduly take advantage of Plaintiff or take wrongful actions in order to unjustly enrich itself at Plaintiff's expense or at the expense of Plaintiff's financial interests.

101.     Nonetheless, Azzuro unjustly enriched itself by enjoying the benefits of Plaintiff's significant time, resources and expense in promoting Azzuro's business and obtaining the Projects

COMPLAINT

without paying any compensation to Plaintiff.

102.    Azzuro additionally deprived Plaintiff of the ability to pursue the Projects with an alternative supplier, even after Azzuro improperly terminated the EAR Agreement.  As such, any opportunity Plaintiff obtained for Azzuro was an opportunity Plaintiff could not proffer to any other client, even if Azzuro elected not to pursue or to abandon the project.

103.    Azzuro has also been unjustly enriched to the extent that Azzuro is continuing to reap the benefits of Plaintiff's network and contacts, without any compensation to Plaintiff.

104.    Such acts leading to Azzuro's unjust enrichment were the actual and proximate cause of harm to Plaintiff.

**COUNT VI**

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

105.    Plaintiff incorporates Paragraphs 1 through 104 above by reference as though set forth fully herein.

106.    Plaintiff has a valid business expectancy with companies such as Galfar, the Salalah Sanitary Drainage Service Company (the "SSDC"), the Dubai Municipality, Aresco Trading Company LLC ("Aresco") and Metito Overseas Ltd. ("Metito"), with whom Plaintiff has worked closely for numerous years.  For example, Plaintiff has maintained a business relationship with Galfar and the Dubai Municipality, specifically, since Plaintiff was founded in 2005.

107.    At all relevant times, Azzuro was aware of Plaintiff's existing business relationship with Galfar, the SSDC, the Dubai Municipality, Aresco, Metito and other companies.

108.    Azzuro intentionally interfered with Plaintiff's business expectancy with Galfar, the SSDC, the Dubai Municipality, Aresco, Metito and other companies by *inter alia* improperly attempting to manipulate design and product specifications to Azzuro's benefit; failing to attend key meetings; causing project delays; and engaging in other unprofessional conduct in connection

with Projects that Plaintiff obtained on Azzuro's behalf.

109.    Azzuro likewise intentionally interfered with Plaintiff's business expectancy with Galfar, the SSDC, the Dubai Municipality, Aresco, Metito and other companies by spreading false information related to Plaintiff's performance under the EAR Agreement and the purported reasons underlying Azzuro's termination of the EAR Agreement to these companies.

110.    For example, on or about October 2, 2019, Azzuro's RSM, Erik Schut, falsely represented to personnel from Galfar that "we have been confronted with the fact that Invent lost important staff. After thorough evaluation Azzuro has terminated its Sales Representation Agreement with Invent U.A.E. . . . In terms of point of contact for all project execution and related questions please contact Azzuro directly."

111.    Azzuro knew this statement—that Plaintiff had "lost important staff" and could no longer adequately perform under the EAR Agreement—to be false at the time it was made, as Azzuro had made this same false claim in the Termination Letter, stating, "You did not inform us of the termination of Michelle's employment with Invent and we now understand that her potential successor and the successor of her successor have subsequently also ceased to work for Invent UAE Co. LLC."  At that time, Plaintiff corrected Azzuro's false statement that Plaintiff was inadequately staffed, explaining that "projects are moving forward and the scope of works for M/s Invent is being fulfilled."

112.    Azzuro's improper actions reflect poorly upon Plaintiff, constitute intentional interference, and have damaged Plaintiff's business relation and expectancy with Galfar, the SSDC, the Dubai Municipality, Aresco, Metito and other companies.

113.    As a result of Azzuro's intentional interference, to date Plaintiff has not obtained any new projects with Galfar, the SSDC, the Dubai Municipality, Aresco and other companies since Azzuro improperly terminated the EAR Agreement, despite Plaintiff's previously fruitful business

relationships with those companies.

114.    As a direct and proximate result of Azzuro's actions, Plaintiff has suffered damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for a judgment against the Azzuro as follows:

a.    A judicial declaration that Plaintiff is entitled to the payment of commission from Defendants in connection with the Pipeline Projects in accordance with Sections 7, 8 and 18 of the EAR Agreement, as Defendants receive payment(s) from the end customers on those projects;

b.    Awarding Plaintiff compensatory damages in an amount to be proven at trial;

c.    Awarding Plaintiff equitable relief as a result of Defendants' unjust enrichment;

d.    Awarding Plaintiff pre-judgment interest on all damages awarded and post-judgment interest until paid, at a lawful rate;

e.    Awarding Plaintiff all of its reasonable expenses, including attorneys' fees, incurred in relation to this dispute;

f.    Finding Defendant Koers to be the alter ego of Defendant Azzuro, thus justifying the piercing of Azzuro's corporate veil so that Defendant Koers is personally liable for the acts and omissions of Defendant Azzuro; and

g.    Awarding Plaintiff any such other relief as the Court deems just and equitable.


Dated: February 11, 2022                    Respectfully submitted,



                                            BAKER & McKENZIE LLP
                                            Aaron Goodman (Arizona Bar No. 024401)
                                            Aaron.Goodman@bakermckenzie.com
                                            Baker & McKenzie LLP
                                            10250 Constellation Boulevard
                                            Suite 1850

COMPLAINT

Los Angeles, California 90067
Telephone: +1 310 201 4728
Facsimile: +1 310 201 4721

and

BAKER & McKENZIE LLP
Jennifer Ancona Semko
Marisa Bakker
(request for *pro hac vice* admission to be filed)
815 Connecticut Avenue NW
Washington, D.C. 20002
Telephone: +1 202 835 4250
Facsimile: +1 202 416 7055

*Attorneys for Plaintiff*
*Invent UAE Co. LLC*

COMPLAINT